IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CATAHAMA, LLC,<br>　　　　　Plaintiff,<br><br>　　　　　v<br><br>FIRST COMMONWEALTH BANK,<br>　　　　　Defendant. | )<br>)<br>)<br>)   2:11-cv-583<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM OPINION AND ORDER OF COURT**

Now pending before the Court is DEFENDANT FIRST COMMONWEALTH BANK'S MOTION TO DISMISS PURSUANT TO F.R.C.P. 12(b)(6) (Document No. 48). Defendant (the "Bank") filed a brief in support of its motion and also submitted numerous exhibits. Plaintiff ("Catahama") filed a brief in opposition to the motion and it is ripe for disposition.

Factual and Procedural Background

As more fully set forth in the Court's Memorandum Opinion of June 24, 2011 in a related case (Civil Action No. 10-1140), the Bank foreclosed on its security interest in a state-of-the-art food manufacturing facility and equipment located in Dubois, Pennsylvania (the "Facility") in the summer of 2008 and thereby obtained title. To preserve the value of its collateral, the Bank preferred to keep the Facility occupied and operating. In March-April 2009, after extensive negotiations, the Bank and Fresh Harvest River, LLC ("FHR") entered into a series of agreements, including a mortgage, lines of credit and a temporary lease. FHR continued to possess and operate the Facility while further negotiations ensued. In October 2009, FHR was unable to make a required $2,500,000 down payment because Abramson, the FHR partner who

1

was to supply the money, backed out. This problem coincided with an unforeseen and historic economic downturn that devastated the real estate market, consumer food demand and FHR's business prospects. FHR advised the Bank of these developments, and of its plan to locate new investors. The Bank and FHR agreed to adjourn the closing indefinitely. FHR remained in possession of the premises. By January 2010, FHR had reached its credit limit and the Bank advised FHR that it was unwilling to loan additional funds under the lines of credit. FHR advised David Hepler, a senior officer of the Bank, that without additional funding FHR would be forced to discontinue operations.

As pled in the Amended Complaint, in February 2010, Jack Gray of FHR approached Catahama to act as a potential investor. Catahama was willing to provide working capital and to advance funds to fulfill specific purchase orders placed by FHR's customers, under certain conditions, including that FHR assign its accounts receivable ("A/R") to Catahama. To accomplish this assignment, FHR's invoices would direct the customers to remit payment directly to Catahama. Catahama also expressly conditioned its agreement to advance funds on the Bank's forbearance from enforcing any security interest the Bank may have had in the A/R created by Catahama's funding of customer orders.

No later than February 2010, Gray informed Hepler that Catahama was a potential funding source and advised the Bank of Catahama's conditions. The Bank was aware that without funding, FHR would discontinue operations and the value of the Bank's collateral would be reduced. Accordingly, Hepler told Gray "with the knowledge and intent that Mr. Gray would share the information with Catahama" that the Bank agreed to Catahama's conditions. On one occasion, Gray introduced Hepler to a then-member of Catahama and Hepler indicated his awareness of Catahama's role.

Subsequently, relying on the Bank's forbearance representation, Catahama and FHR entered into a written agreement. Between March and September 2010, Catahama loaned $2,162,375.15 to FHR. The Bank took no steps to enforce any security interest it held in the A/R until July 2010.

In May 2010, Catahama began direct negotiations with FHR and the Bank concerning the acquisition of the Facility. On June 3, 2010, Paul McGrath, an attorney representing the Bank, met with Catahama and FHR in Catahama's New York offices. During the meeting, and another meeting on June 10, 2010, the Bank, Catahama and FHR discussed Catahama's loans to FHR, terms for purchase of the Facility and FHR's repayment of the credit lines. The Bank reaffirmed its consent to the financing arrangement between Catahama and FHR. At no point did the Bank announce any intent to renege on its forbearance representation. Unbeknownst to Catahama, the Bank had entered into an agreement to sell the facility to the Kerry Group ("Kerry"), an Irish firm which had engaged FHR to serve as one of its suppliers.

On May 6, 2010 the Bank issued a letter to FHR to give formal notice that the Bank had elected to terminate the lease for non-payment of rent from September 2009 through April 2010. Notwithstanding the letter, FHR remained in possession of the Facility and the Bank and Catahama continued to negotiate a sale of the Facility through at least the end of June 2010. Plaintiff alleges that the Bank never demanded that FHR enter a new lease after the prior lease expired on October 30, 2009 and that no rent was owed. At a meeting on July 6, 2010 Hepler advised Gray that: (1) the Bank had entered into an agreement with Kerry; (2) the Bank's termination of the lease as set forth in the May 6 letter was effective; and (3) the Bank's claim for unpaid rent was effective. FHR was instructed to vacate the Facility.

Shortly after this meeting, Catahama determined that it would cure any alleged default claimed by the Bank against FHR. At Catahama's request, FHR contacted the Bank to confirm where payment of the rent arrearages should be directed. The Bank identified a specific account. Catahama wired $575,000 into the account specified by the Bank. Catahama intended the payment to cover the purported rent default and sent excess funds to cover future purported rent. The wire transfer was directed to the attention of Hepler. The Bank knew that Catahama was the source of the funds and that Catahama intended the funds to cure the arrearage in rent payments when it accepted the funds. On a July 30, 2010 "earnings call" with stock analysts, the Bank's Chief Financial Officer reported that the funds were rental income generated by a tenant of the Facility. Three days later, in litigation before the Honorable Paul Cherry, the Bank took a contrary position and represented that there was no cure option under the lease and that it had applied the funds to FHR's lines of credit.

In late July 2010, the Bank issued letters and telephonic demands to FHR customers, to demand that they pay directly to the Bank all A/R due to FHR. FHR could not have generated these receivables but for Catahama's agreement to fund FHR's operations and finance the filling of customer orders. By interfering with the payments to Catahama, the Bank was attempting to obtain a windfall from funds which only existed because of Catahama's loans to FHR.

This case was filed by Catahama on its own behalf.[1] The case was originally filed in the United States District Court for the Southern District of New York and was transferred to this Court in May 2011. On June 20, 2011 the Bank filed a Motion to Dismiss the original complaint (Document No. 40). This motion was rendered moot by the filing of a new three-count Amended Complaint by Catahama. In Count 1, Catahama seeks a declaration that: (1)

---

[1] The related case, Civil Action No. 10-1140, was brought by Catahama as an assignee of FHR's rights. In the June 24 Opinion, the Court dismissed all of FHR's claims against the Bank and Plaintiff declined to re-plead.

Catahama is entitled to receive payment from FHR's customers where the invoices state that payment be made to Catahama; and (2) the Bank has no right to receive payment of A/R that were generated from advances made by Catahama to FHR. In Count 2, Catahama asserts a claim for unjust enrichment. In Count 3, Catahama asserts a violation of 13 Pa.C.S.A. § 4A205, on the theory that Catahama made a mistake of fact by erroneously instructing a payment of funds to the wrong account. The Bank seeks to dismiss the Amended Complaint in its entirety.

Standard of Review

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is a challenge to the legal sufficiency of the complaint filed by Plaintiff. The United States Supreme Court has held that "[a] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (*citing Papasan v. Allain*, 478 U.S. 265, 286 (1986)) (alterations in original).

The Court must accept as true all well-pleaded facts and allegations, and must draw all reasonable inferences therefrom in favor of the plaintiff. However, as the Supreme Court made clear in *Twombly,* the "factual allegations must be enough to raise a right to relief above the speculative level." *Id*. The Supreme Court has subsequently broadened the scope of this requirement, stating that "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, -- U.S. --, 129 S. Ct. 1937, 1950 (2009).

However, nothing in *Twombly* or *Iqbal* has changed the other pleading standards for a motion to dismiss pursuant to Rule 12(b)(6). That is, the Supreme Court did not impose a new, heightened pleading requirement, but reaffirmed that Federal Rule of Civil Procedure 8 requires

only a short, plain statement of the claim showing that the pleader is entitled to relief, not "detailed factual allegations." *See Phillips v. Co. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (*citing Twombly*, 550 U.S. at 552-53). Additionally, the Supreme Court did not abolish the Rule 12(b)(6) requirement that "the facts alleged must be taken as true and a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." *Id*. (*citing Twombly*, 550 U.S. at 553). As described in *Fowler v. UPMC Shadyside*, 578 F.3d 203, 206 (3d Cir. 2009), the Court must first distinguish between factual allegations and legal conclusions in the complaint and then determine whether the well-pleaded factual allegations and favorable inferences drawn therefrom show an entitlement to relief.

Legal Analysis

As an initial matter, the Court will consider the numerous documents the Bank has submitted. The Court documents were referenced in the complaint and are of undisputed authenticity. *See Pension Benefit Guar. Corp. v. White Consol. Industries, Inc*., 998 F.2d 1192, 1196 (3d Cir. 1993). In addition, the Court will take judicial notice of: (1) the Opinion and Order issued by Judge Paul E. Cherry of the Court of Common Pleas of Clearfield County, Pennsylvania on September 3, 2010; (2) the Order Dismissing the Case issued by Chief United States Bankruptcy Judge Arthur J. Gonzalez of the United States Bankruptcy Court for the Southern District of New York on November 5, 2010; and of course, this Court's June 24 Opinion in the related case. *See McTernan v. City of York*, 577 F.3d 521, 526 (3d Cir. 2009).

1. Declaratory Judgment – Promissory Estoppel

Count 1 arises from the Bank's attempt to recover customer A/R. The Bank contends that Count1 is barred by res judicata because this Court held in the June 24 Opinion in Civil Action No. 10-1140 that the Bank was not barred from acting on its security interest. The Court cannot agree. The Amended Complaint in this case pleads additional factual averments that were not pled in the related case. Moreover, Civil Action No. 10-1140 analyzed the Bank's rights *vis a vis* FHR, while this case involves the distinct issue of the Bank's rights as to Catahama.

The Bank correctly notes that Plaintiff did not clearly identify a legal theory in the Amended Complaint and analyzes "third-party beneficiary" and "promissory estoppel" theories. In its response, Plaintiff clarifies that it is pursuing only a "promissory estoppel" theory. Under Pennsylvania law, the elements of a promissory estoppel claim are: "1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee; 2) the promisee actually took action or refrained from taking action in reliance on the promise; and 3) injustice can be avoided only by enforcing the promise." *Crouse v. Cyclops Industries*, 745 A.2d 606, 610 (Pa. 2000). The Bank contends that the promissory estoppel theory fails on the ground that it was not reasonable for Catahama to rely on the alleged representations made by Hepler to FHR.

The Court concludes that the Amended Complaint adequately alleges a promissory estoppel claim. Taking the averments in the Amended Complaint as true, the Bank directly and/or indirectly promised Catahama that it would forbear from exercising its security interest in customer A/R generated by Catahama's financing of FHR orders. The Bank knew that Catahama would not extend financing to FHR in the absence of the Bank's forbearance.

Because the customer A/R allegedly would not have been generated but for the Catahama financing, injustice has been adequately pled.

The reasonableness of Catahama's conduct certainly remains at issue. Catahama concedes that the Bank complied with its forbearance representation for at least five months, but apparently asks the Court to declare that the Bank had a duty to forbear indefinitely. The lack of formalities and written documentation also weighs against Catahama. It is striking that Catahama never entered into a subordination agreement directly with the Bank. On the other hand, the Bank's alleged compliance for five months and alleged multiple confirmations of its forbearance representation, which induced Catahama to finance FHR's production, followed by the Bank's alleged reneging without notice, could support a plausible promissory estoppel claim. Further development of the record is needed. In sum, Count 1 of the Amended Complaint states a cognizable promissory estoppel claim.

2.  Unjust Enrichment

This claim is based on the $575,000 wire transfer. The Bank contends that Catahama was acting as a "volunteer" in making the payment, and therefore, it had no right to restitution for unjust enrichment. The Bank also argues that Catahama lacks standing to obtain recovery, and that it was not "unjustly" enriched because FHR's obligations far exceeded the amount of the payment.

In *Clarity Software, LLC v. Allianz Life Ins. Co. of North America*, 2006 WL 2346292 * 12 (W.D. Pa. 2006), this Court summarized the principles of Pennsylvania law governing unjust enrichment claims as follows:

> 'Unjust enrichment' is essentially an equitable doctrine." *Mitchell v. Moore*, 729 A.2d 1200, 1203 (Pa.Super.1999), *appeal denied*, 751 A.2d 192 (Pa.2000)

(citation omitted). "Where unjust enrichment is found, the law implies a contract, which requires the defendant to pay to the plaintiff the value of the benefit conferred." *Id*. (citation omitted). The elements of unjust enrichment are: (1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value. *Id*. "The application of the doctrine depends on the particular factual circumstances of the case at issue ." *Id*. at 1203-04. "In determining if the doctrine applies, [the Court's] focus is not on the intention of the parties, but rather on whether the defendant has been unjustly enriched." *Id*. at 1204; *see also Torchia v. Torchia*, 499 A.2d 581, 582 (1985) ("[t]o sustain a claim of unjust enrichment, a claimant must show that the party against whom recovery is sought either 'wrongfully secured or passively received a benefit that it would be unconscionable for her to retain.' ") (citation omitted). "The most significant element of the doctrine is whether the enrichment of the defendant is unjust; the doctrine does not apply simply because the defendant may have benefited as a result of the actions of the plaintiff." *Konidaris v. Portnoff Law Associates, Ltd*., 884 A.2d 348, 355 (Pa.Cmwlth. 2005) (citation omitted).

The Court concludes that Plaintiff has pled a cognizable unjust enrichment claim. Taken as true, the averments in the Amended Complaint disclose that Catahama had no legal obligation to send $575,000 to the Bank; that the Bank understood that the payment was for the specific purpose of curing FHR's alleged default on rent payments; that the Bank provided an account number to Catahama for this purpose; and that the Bank unilaterally (and without notice to Catahama) applied the $575,000 payment to a different account for a different purpose. Allegedly, the Bank never informed Catahama that FHR's alleged breach of the lease was non-curable. The Bank was aware of Catahama's role as a financial investor, and that Catahama was making the payment in expectation of achieving a particular result – i.e., curing FHR's rent default. Under these circumstances, if proven, the Bank's retention of the payment was unjust. Further, Catahama has standing because it was Catahama that made the payment to the Bank. In summary, Count 2 of the Amended Complaint states a cognizable claim for unjust enrichment.

3. Erroneous Payment Order

In Count 3, Catahama seeks recovery of the $575,000 wire transfer. Plaintiff alleges a violation of the Pennsylvania Uniform Commercial Code ("UCC"), 13 Pa.C.S.A. § 4A205 (Erroneous payment orders), which states, in relevant part (emphasis added):

> (a) Types of erroneous payment orders.--
>
> (1) The rules set forth under paragraph (2) apply *if* an accepted payment order was transmitted pursuant to a **_security procedure_** for the detection of error **_and_** the payment order:
>
> (i) erroneously instructed payment to a beneficiary not intended by the sender; …
>
> (2) … (ii) If the funds transfer is completed on the basis of an erroneous payment order described in paragraph (1)(i) or (iii), the sender is not obliged to pay the order and the **_receiving bank_** is entitled to recover from the beneficiary any amount paid to the beneficiary to the extent allowed by the law governing mistake and restitution.

The Bank contends that the facts of this case do not fall within the three errors contemplated by the statute, namely: (1) wrong beneficiary; (2) wrong amount; and (3) duplicate payment. The Bank also contends that the Amended Complaint fails to allege that the transfer was made pursuant to a "security procedure," as defined in 13 Pa.C.S.A. § 4A201. Finally, the Bank contends that Catahama lacks standing because only a "receiving bank" may recover under this section.

Catahama concedes that it is not a "receiving bank" but explains that the alleged misapplication of the $575,000 wire transfer was not discovered until after it had satisfied the payment order. Thus, the "receiving bank" "has no interest or incentive to seek the return of the Wire Transfer." Plaintiff's Brief at 19. Unfortunately for Plaintiff, the plain text of the statute provides that only a "**_receiving bank_** is entitled to recover" any amount paid to the beneficiary. The statute does not give the "sender" a right to recover and Catahama has provided no citation

of authority for its novel position. In essence, it simply asks the Court to ignore the statutory language. Accordingly, Count 3 of the Amended Complaint will be dismissed with prejudice.

Conclusion

In accordance with the foregoing, DEFENDANT FIRST COMMONWEALTH BANK'S MOTION TO DISMISS PURSUANT TO F.R.C.P. 12(b)(6) (Document No. 48) will be **GRANTED IN PART AND DENIED IN PART**. Count 3 of the Amended Complaint will be **DISMISSED WITH PREJUDICE**. The Bank shall file an Answer to Counts 1 and 2 of the Amended Complaint.

An appropriate Order follows.

McVerry, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CATAHAMA, LLC,<br>                Plaintiff,<br><br>             v<br>FIRST COMMONWEALTH BANK,<br>                Defendant. | )<br>)<br>)<br>)  2:11-cv-583<br>)<br>)<br>)<br>)<br>)<br>) |

**ORDER OF COURT**

AND NOW, this 31st day of October 2011, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED and DECREED** that: the **MOTION TO DISMISS** the original complaint (Document No. 40) is **DENIED AS MOOT**; and DEFENDANT FIRST COMMONWEALTH BANK'S MOTION TO DISMISS PURSUANT TO F.R.C.P. 12(b)(6) (Document No. 48) is **GRANTED IN PART AND DENIED IN PART**. Count 3 of the Amended Complaint is **DISMISSED WITH PREJUDICE**. Said Motion is **DENIED** as to Counts 1 and 2. The Bank shall file an Answer on or before November 14, 2011 as to Counts 1 and 2 of the Amended Complaint.

                                                    BY THE COURT:

                                                    s/Terrence F. McVerry
                                                    United States District Judge

cc: **Kevin K. Douglass, Esquire**
Email: kdouglass@bccz.com
**Jason Levin, Esquire**
Email: jlevin@samlegal.com
**Lita Beth Wright, Esquire**
Email: lbwright@samlegal.com
**Steven G. Storch, Esquire**
Email: storch@samlegal.com

**Justin L. McCall, Esquire**
Email: jmccall@lenderlaw.com
**Nicholas A. Didomenico, Esquire**
Email: ndidomenico@lenderlaw.com