# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CATAHAMA, LLC<br>    Plaintiff,<br><br>v<br><br>FIRST COMMONWEALTH BANK,<br>    Defendant. | )<br>)<br>)<br>) 2:11-cv-583<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION AND ORDER OF COURT

Now pending before the Court in this complex commercial dispute is DEFENDANT FIRST COMMONWEALTH BANK'S MOTION FOR SUMMARY JUDGMENT (ECF No. 93), with brief in support. Plaintiff Catahama, LLC ("Catahama") filed a brief in opposition to the motion and the Bank filed a reply brief. The parties have also thoroughly developed their respective positions regarding the Concise Statement of Material Facts ("CSMF") and have submitted numerous exhibits. On September 17, 2013 the Court heard oral argument on the motion and it is ripe for disposition.

Factual and Procedural History

The facts must be viewed in the light most favorable to Catahama, the non-moving party. The Court has previously recounted the background of this matter in its October 31, 2011 Memorandum Opinion on the motions to dismiss the Amended Complaint in this case. There is also a related case, Civil Action No. 10-1140. The Court will now focus on the two claims remaining in this case: (1) promissory estoppel based on the Bank's alleged agreement to forbear action on its security interest in the customer accounts receivable ("A/R") of Fresh Harvest River ("FHR"); and (2) unjust enrichment based on the Bank's retention of a $575,000 wire transfer from Catahama on July 12, 2010.

In March 2009, the Bank became the owner of an operating, state-of-the-art food manufacturing facility, land and equipment located in Dubois, Pennsylvania (the "Facility"). Fundamental to Plaintiff's theory of the case, the Bank preferred to keep the Facility occupied and operating to preserve the value of its collateral. Jack Gray, Paul Grillo and Edmund Abramson formed FHR for the purpose of operating and eventually acquiring the Facility.

On April 1, 2009, the Bank and FHR entered into a Real Estate Lease which terminated, by its terms, on April 30, 2009. The Real Estate Lease was extended by letters from Paul McGrath, the Bank's attorney, to FHR dated May 1, 2009 and June 2, 15 and 26, 2009. On August 1 and 31, 2009, the Bank and FHR entered into a First Amendment and Second Amendment to the Real Estate Lease, by which the term was extended until October 30, 2009. The Second Amendment to the Real Estate Lease provided, inter alia, that:

> On the Lease Expiration Date, the lease of the Premises shall terminate unless Lessor agrees in writing to extend the term of this Agreement to Lease for an additional period of time beyond October 30, 2009. Tenant shall not be required to deactivate the facility or vacate the Premises by October 30, 2009 provided that Lessor and Tenant either (i) enter into a written agreement by August 31, 2009 which does not require such actions by Tenant to be taken, or (ii) close on the sale of the Premises by Lessor to Tenant by October 30, 2009.

The Second Amendment reflected that FHR had made a lump sum payment of $40,000 as rent for this two-month period. By contrast, the First Amendment had reflected a $40,000 rent payment for a one-month period. The Second Amendment § 12 contained a "confession of judgment" clause by which Lessor could obtain possession of the Facility that reflected: "A termination of the term hereof, or the receipt of rent after default, or after judgment, or after execution, shall not deprive Lessor of other actions against Tenant for possession or for rent or for damages." The Second Amendment § 23 contained an integration clause which provided that the Lease shall not be modified or amended except by written instrument; "however, an

extension of the term hereof may be granted by Lessor by letter to Tenant." The Bank and FHR never entered into any agreement to extend the Real Estate Lease beyond October 30, 2009. The Bank did not ask FHR to enter into further extensions or amendments or indicate that FHR should vacate the Facility. Accordingly, FHR continued to occupy and operate the Facility without paying rent.

In the summer of 2009, the Bank and FHR also entered into an Equipment Lease, which included an option for FHR to purchase the equipment for $16,000,000. Payments of $80,000 were to commence on January 1, 2010, but the Bank agreed to forego payments in an effort to close the original deal for FHR to purchase the Facility.

On June 23, 2009, the Bank delivered two commitment letters to FHR, a $3,000,000 Revolving Line of Credit and a $3,000,000 Non-Revolving Line of Credit. As collateral for the lines of credit, FHR entered into two security agreements by which it assigned and pledged to the Bank first lien position security interests in all of FHR's business assets, including A/R. The Bank perfected its security interests by filing UCC Financing Statements.

On August 31, 2009, the Bank and FHR entered into an agreement whereby FHR would purchase the Real Estate for $10,000,000. Closing was set for October 30, 2009. The sale to FHR was never consummated, due to the failure of FHR to make a $2,500,000 down payment; the failing health of Abramson, who was to supply the money; issues raised by the Bank with respect to an unrelated transaction with Abramson; and FHR's need to solicit new investors. Plaintiff also points to unspecified wrongful conduct by the former owner of the Facility. Plaintiff alleges that the Bank and FHR agreed to postpone the closing without date. The Bank permitted FHR to remain in possession of the Facility. The parties dispute FHR's status during this time period.

By January 2010, FHR had borrowed $3,000,000 under the Non-Revolving Line of Credit and had reached the maximum credit available under the Revolving Line of Credit. The Bank advised FHR that it was unwilling to loan additional funds under the credit lines in early January 2010. David Hepler, Senior Vice President of the Bank, believed that FHR was in "formula default" at this time, although a default letter was not issued until May 6, 2010.

In early February 2010, FHR identified Catahama, and its principal Herbert Feinberg, as a potential investor and "factor." In that role, Catahama would advance funds to fulfill specific purchase orders placed by FHR customers. Plaintiff alleges that Catahama was willing to provide working capital and to fund customer orders, conditioned on obtaining: (1) a first lien collateral security position in ingredients, inventory, work in progress and receivables created from the financing of those customer orders; and (2) FHR's assignment of A/R to Catahama, through a direction on FHR's invoices that the customer remit payment directly to Catahama. Pursuant to a memo from Gray to Grillo and Abramson, Catahama also required that Grillo and Abramson assign their interests in FHR to Gray and that all of FHR's owners pledge their shares as additional collateral. The memo identified other issues "yet to be decided," such as the rate of return and percentage of equity which Catahama would receive.

Gray testified that he informed Hepler of Catahama's conditions. According to Gray, Hepler was pleased with the new funding source and "Hepler also assured me the Bank would not claim an interest in the receivables, ingredients or inventory funded by Catahama. I told Mr. Hepler I would let Catahama know of our discussion and that I would finalize the arrangements." Gray Declaration § 55. Gray then called Feinberg. From Gray, Feinberg understood the Bank to have agreed to allow FHR to pledge to Catahama the receivables generated by Catahama's financing of customer orders, but had drawn the following line: "if Catahama funded FHR's

4

fulfillment of a customer order, then Catahama would be entitled to the proceeds generated by that order, but Catahama would not be entitled to any assets unrelated to Catahama's funding of FHR's customer orders." Feinberg Declaration § 8. Feinberg and the Bank never spoke directly regarding Catahama's role as a factor.

Plaintiff has not provided any further details regarding this alleged forbearance agreement between the Bank and FHR and it was apparently not memorialized in writing. Hepler denies making a forbearance representation. In Gray's deposition, he testified that Hepler may not have said explicitly that the Bank would agree to not enforce its security interests, "but it was clear from all of our discussions." Otherwise, according to Gray, a new lender would not have been willing to advance funds without obtaining a security interest.

There was no formal, written lien subordination or forbearance agreement between Catahama and the Bank. No attempt was made by Catahama to confirm in writing that the Bank was agreeable with Catahama serving as factor.

FHR obtained its first factored loan from Catahama on February 9, 2010. FHR and Catahama entered into a revolving $500,000 Credit Facility and Financing Agreement on February 16, 2010. The Bank was not a party to this Agreement. The amount of the Credit Facility increased over time. In total, FHR borrowed $2,162,375.15 from Catahama. The Bank acted in apparent conformity with the factoring arrangement between February and July 2010. In mid-March 2010, Hepler allegedly told Harry Feinberg (Herbert's son) and Andrew Maxon from Catahama, who were visiting the Facility, that he was aware of their involvement and happy for the financing. Maxon Declaration at 9.

On April 8, 2010, FHR and Kerry entered into a letter of intent by which Kerry agreed to buy the Facility from FHR for $22,000,000. In a letter dated April 27, 2010, Robert Koen,

5

counsel for FHR, notified the Bank that it had identified a new equity source and was prepared to make an offer of $16,000,000 in cash for both the Real Estate and the Equipment (which represented a reduction from the initial price of $26,000,000.)

On May 6, 2010, McGrath sent a "Notice of Termination" letter to FHR. The letter stated that FHR was past due on rent payments from September 2009-April 2010 totalling $320,000.00; and that the inability of FHR to close on the Real Estate sale constituted a default under the Agreement of Sale and was grounds for early termination of the Equipment Lease. The letter stated that it "shall constitute formal written notice to FHR that the Bank is, at this time, declaring FHR to be in default . . .. [and] is electing to terminate the Agreement of Sale." The letter further served "as formal written notice to FHR that the Bank has elected to terminate the lease of the Real Estate as of May 31, 2010." The Bank demanded payment of several items of alleged damages, including $320,000 in past due rent and $40,000 for rent in May. McGrath sent three other letters on May 6, 2010, to notify FHR of its default on the Equipment Lease and lines of credit. The letters stated that any questions should be directed to McGrath or Hepler.

In the Declaration of Jack Gray, he explains that the May 6 letters were never intended to be acted upon. Instead, according to Gray, Hepler told Gray that he was sending the letters to increase the Bank's leverage in an unrelated dispute with Abramson and assured Gray that the Bank would not act on the letters. The Bank did not seek possession of the Facility, shut down FHR's operations or exercise claimed rights as a secured creditor. Instead, the Bank continued to negotiate with FHR through early July 2010.

In March 2010, FHR performed a large order for Kerry, an Irish company which developed an interest in buying the facility. On April 8, 2010, Kerry and FHR entered into a letter of intent by which Kerry would buy the Facility from FHR for $22,000,000. In late May,

Kerry terminated the letter of intent. On June 3, 2010, McGrath met with Feinberg, Gray, Grillo and Alan Kaufman, counsel for Catahama, and Feinberg presented a letter of intent to purchase the Facility. The next day, McGrath and Feinberg spoke by phone. Feinberg told McGrath that he had acquired Abramson's share of FHR and now owned a 60% interest in FHR. Catahama now explains in its CSMF that Feinberg was going to obtain an interest in FHR only if the sale transaction with the Bank was concluded. Negotiations continued, but the transaction never closed. On June 10, 2010 the Bank, FHR and Catahama personnel met again in Pittsburgh to negotiate. On June 11, Feinberg believed that the parties had reached an agreement and that McGrath was going to prepare a written contract. When they spoke on June 14, however, McGrath denied that an agreement had been reached.

The Bank began negotiations with Kerry. On June 27, 2010 Feinberg sent a letter to Kerry in which he stated that he was the controlling owner and held a 60% interest in FHR and was in the process of acquiring the Facility. Feinberg suggested a personal meeting in an effort to avoid litigation. On July 2, 2010, the Bank entered into an agreement to sell the Facility to Kerry. On July 6, 2010, Hepler advised Gray of this agreement; that the Bank took the position that the May 6 letters were effective; and demanded that FHR quit the premises as of July 26, 2010.

On July 12, 2010, Catahama wired $575,000 to the Bank on behalf of FHR. The decision to make the payment was made by Feinberg, Gray and Catahama attorney Alan Kaufman. The amount was intended to cure the default in rent payments claimed by the Bank in the May 6 letters and also cover future purported real estate obligations. Gray's colleague Tanya Marvin-Horowitz contacted the Bank to ask for instructions for making a payment on FHR's mortgage loan. Christine Pierce, the Bank's wire room employee, was confused because FHR did not have

7

a mortgage account and simply sent Horowitz a fax with a list of all of FHR's bank accounts. The list was given to Gray. Gray and Feinberg could not determine the correct account, either, and Gray called the Bank's DuBois branch. The unknown employee to whom he spoke told him to direct the payment to the account ending in "99999." Catahama wired $575,000 to that account. The wire instructions directed application of the payment to the "Open-End Mortgage, Security Agreement, and Fixture Filing dated August 31, 2009." The wire was directed to the attention of Hepler, but he was on vacation on July 12. Bank personnel, likely Brenda Wainwright, without contacting FHR or Hepler, applied the payment to a different account, ending in "00199." The "99999" and "00199" accounts were related, with the "99999" account tracking the availability of a commercial line of credit and the "00199" account tracking the balance owed on that line of credit. When Hepler returned to work, he wondered why Catahama had sent the funds but he kept those thoughts to himself.

Litigation commenced. On July 20, 2012, FHR filed a lawsuit against the Bank and Kerry seeking: specific performance of a sale to FHR; a declaration that the termination of FHR's rights was null and void; and an annulment of the sale to Kerry. On July 26, 2010 the Bank filed three actions based on the Confession of Judgment provisions in the Second Amendment to the Lease and the credit line agreements. On July 29, 2010, the Bank sent letters to FHR's customers to divert A/R payments from Catahama to the Bank.

Standard of Review

Summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.

R. CIV. P. 56(a). The movant must identify those portions of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To withstand summary judgment, the non-movant must show a genuine dispute of material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). A dispute is "genuine" only if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

Discussion

There are only two remaining claims: (1) promissory estoppel regarding the A/R payments; and (2) unjust enrichment regarding the $575,000 wire transfer. The Bank seeks summary judgment on both claims. The Court will address them seriatim.

A. Promissory Estoppel

As explained in its earlier Opinion, *Luther v. Kia Motors America, Inc.,* 676 F.Supp.2d 408 (W.D. Pa. 2009), provided a concise summary of the legal principles which govern promissory estoppel claims:

> To establish a promissory estoppel claim under Pennsylvania law, the plaintiff must show that
>
> 1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee;

> 2) the promisee actually took action or refrained from taking action in reliance on the promise; and
>
> 3) injustice can be avoided only by enforcing the promise.
>
> Promissory estoppel is "an equitable remedy to be implemented only when there is no contract; it is not designed to protect parties who do not adequately memorialize their contracts in writing."
>
> The elements of promissory estoppel are "(1) misleading words, conduct or silence by the party against whom the estoppel is asserted; (2) unambiguous proof of reasonable reliance on the misrepresentation by the party seeking to assert the estoppel; and (3) no duty of inquiry on the party seeking to assert estoppel." These elements must be established by "clear and convincing evidence."
>
> To succeed on a promissory estoppel claim, the plaintiff must further establish that the action he took "amounted to a substantial change of position." A claim for estoppel cannot survive when the plaintiff's actions were based on "his own will and judgment" rather than the defendant's representations.

*Id*. at 421-422 (citations omitted). Although the Court denied the Bank's motion to dismiss this claim, it expressed doubts about the reasonableness of Catahama's reliance on statements made by Hepler to Gray and noted the lack of formalities or a written subordination agreement between Catahama and the Bank. As the party claiming estoppel, it is Catahama's burden to establish all elements this claim. *Thatcher's Drug Store of West Goshen, Inc. v. Consolidated Supermarkets, Inc.*, 636 A.2d 156, 160 (Pa. 1994).

As both parties acknowledged at oral argument, the efforts to keep the Facility operating and to close the deal with FHR proceeded over many months and without clear documentation. At the summary judgment stage, the Court assumes that Hepler made promises on behalf of the Bank and that Catahama relied thereon. The difficult question is the third prong – whether the Court should act to avoid injustice by enforcing an alleged oral promise made to an intermediary (Gray) when a sophisticated investor (Catahama) failed to take efforts to protect itself in writing or talk directly to the Bank.

In *Thatcher's*, the Pennsylvania Supreme Court rejected a promissory estoppel claim at the summary judgment stage under circumstances in which "the terms of the agreement were vague and at risk of being misunderstood" and the parties had failed to exercise "the caution demanded by a situation in which each had significant rights at stake." 636 A.2d at 161. The Court explained that the rule served evidentiary, cautionary, deterrent and channeling functions. The Court is aware of the factual disputes between Gray, Feinberg and Hepler as to the existence and terms of the alleged forbearance agreement. In *Thatcher's*, the Court observed that the commercial setting and witness credibility disputes actually weighed against estoppel – because such considerations illustrated the need to formalize any agreement. The same reasoning applies under the facts and circumstances of this case, even when viewed in the light most favorable to Catahama.[1]

There were no direct contacts – let alone a formalized agreement -- between Catahama and the Bank. The February 16, 2010 Agreement was executed solely between Catahama and FHR and does not specify that Catahama's performance is contingent upon subordination by the Bank. The mere fact that the Bank did not exercise its rights for some months thereafter does not mean that the Bank was forever barred from acting. The Bank had a pre-existing, perfected security interest in all of FHR's assets. Catahama acted at its own risk by extending money without confirming directly with the Bank the specific details and temporal scope of the alleged subordination agreement. In sum, the Court concludes that the Bank is entitled to summary judgment on the promissory estoppel claim.

---

[1] Catahama's reliance on *Dilworth v. Metropolitan Life Ins. Co.*, 418 F.3d 345, 353-54 (3d Cir. 2005), for the proposition that justifiable reliance is a jury question, is misplaced. *Dilworth* involved an individual consumer who was pursuing an unfair trade practice claim against a life insurance company, which is far different than the sophisticated investor seeking promissory estoppel relief in this case.

B. Unjust Enrichment

This Court summarized the legal principles which govern an unjust enrichment claim in *Clarity Software, LLC v. Allianz Life Ins. Co. of North America*, 2006 WL 2346292 at *12 (W.D. Pa. 2006) (citations and punctuation omitted):

> Unjust enrichment is essentially an equitable doctrine. Where unjust enrichment is found, the law implies a contract, which requires the defendant to pay to the plaintiff the value of the benefit conferred. The elements of unjust enrichment are: (1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value. The application of the doctrine depends on the particular factual circumstances of the case at issue. In determining if the doctrine applies, [the Court's] focus is not on the intention of the parties, but rather on whether the defendant has been unjustly enriched. To sustain a claim of unjust enrichment, a claimant must show that the party against whom recovery is sought either wrongfully secured or passively received a benefit that it would be unconscionable for her to retain. The most significant element of the doctrine is whether the enrichment of the defendant is unjust; the doctrine does not apply simply because the defendant may have benefitted as a result of the actions of the plaintiff.

The Bank is entitled to summary judgment on the unjust enrichment claim. There is no evidence in this record that Catahama was wrongfully induced by the Bank into making the payment. Prior to making the payment, Catahama and FHR had received the July 6 notice of default and the Bank's demand that it vacate the Facility. The payment appears to be a calculated response to the July 6 notice which was made with legal advice from Catahama attorney Kaufman. The Bank speculates that the payment was made in order to set up a legal argument for FHR's continued occupation of the Facility and to prevent the sale to Kerry because approximately one week later, FHR sought that relief in a lawsuit against the Bank and Kerry. But whatever Catahama's motive, it was unreasonable for Catahama to make the wire transfer based on information from unknown lower-level Bank employees, particularly given

their confusion with the various account numbers.[2] Catahama could have contacted Hepler and/or McGrath directly, and in advance, to confirm that the Bank would accept payment to cure the rent default, but chose not to do so.

It was not unjust for the Bank to keep the payment under the circumstances. It is the undisputed fact that FHR owed substantial sums (over $4,000,000) to the Bank. Feinberg purported to hold a controlling interest in both FHR and Catahama. The Bank never promised that the payment would cure FHR's default. To the contrary, the Second Amendment to the Lease stated that the receipt of rent after default would not deprive the Bank of its remedies. Nor has Catahama proven that the Bank was on notice that the payment was intended for that specific purpose; the amount did not match the rent arrearage and the wiring instructions received by the Bank simply stated that the wired funds were on behalf of FHR, without further detail.[3]

Under these circumstances, the "Discharge for Value" rule, as set forth in Restatement of Restitution § 14(1), is applicable. The rule provides: "A creditor of another or one having a lien on another's property who has received from a third person any benefit in discharge of the debt or lien, is under no duty to make restitution therefor, although the discharge was given by mistake of the transferor as to his interests or duties, if the transferee made no misrepresentation and did not have notice of the transferor's mistake." On this evidentiary record, the Bank made no misrepresentation to Catahama as to whether the money would cure the default and the Bank did not have notice of Catahama's alleged mistake. The rationale for the rule is that a creditor, by definition, "is a bona fide purchaser for value in giving up his claim and is therefore not

---

[2] Gray's assistant Horowitz asked Pierce, the Bank's wire room employee, how to make a payment on a mortgage loan – there was no such mortgage. Therefore, Pierce faxed a list of all the existing accounts. Gray obtained the actual account number from an unknown employee at the DuBois branch.
[3] The instructions on the second page of the wire transfer, which stated the intent to satisfy the rental arrearage, were not received by the Bank. Even these instructions did not explicitly state that the payment was intended to cure FHR's default.

13

unjustly enriched." *Commonwealth, Dept. of General Services v. Collingdale Millwork Co.*, 454 A.2d 1176, 1180 (Pa. Commw. 1983).[4]

In accordance with the foregoing, the Court concludes that the Bank is entitled to summary judgment on the unjust enrichment claim.

Conclusion

In accordance with the foregoing, DEFENDANT FIRST COMMONWEALTH BANK'S MOTION FOR SUMMARY JUDGMENT (ECF No. 93) will be **GRANTED**.

An appropriate Order follows.

McVerry, J.

---

[4] The Court need not resolve the Bank's alternative argument based on the "voluntary payment doctrine."

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CATAHAMA, LLC<br>         **Plaintiff,**<br><br>         v<br><br>FIRST COMMONWEALTH BANK,<br>         **Defendant.** | )<br>)<br>)<br>) 2:11-cv-583<br>)<br>)<br>) |

## ORDER OF COURT

AND NOW, this 31st day of October, 2013, in accordance with the foregoing Memorandum Opinion, it is hereby ORDERED, ADJUDGED and DECREED that DEFENDANT FIRST COMMONWEALTH BANK'S MOTION FOR SUMMARY JUDGMENT (ECF No. 93) is **GRANTED**.

BY THE COURT:

s/Terrence F. McVerry
United States District Judge

cc: **Kevin K. Douglass, Esquire**
Email: kdouglass@bccz.com
**Jason Levin, Esquire**
Email: jlevin@samlegal.com
**Lita Beth Wright, Esquire**
Email: lbwright@samlegal.com
**Steven G. Storch, Esquire**
Email: storch@samlegal.com
**David D. McKenery , Jr., Esquire**
Email: dmckenery@bccz.com
**Thomas M. Monahan, Esquire**
Email: tmonahan@samlegal.com
**Justin L. McCall, Esquire**
Email: jmccall@lenderlaw.com
**Nicholas A. Didomenico, Esquire**
Email: ndidomenico@lenderlaw.com
**Kirsten S. Miniotis, Esquire**
Email: kminiotis@lenderlaw.com